**In the Matter of Mitchell DURHAM, Bankrupt.**

**No. P–Bk–67–108.**

United States District Court
S. D. Illinois, N. D.

Aug. 15, 1967.

---

James Cummings, Peoria, Ill., for petitioner.

Jerry Stafford, Peoria, Ill., for respondent.

## OPINION AND ORDER

ROBERT D. MORGAN, District Judge.

The pending issue arises on petition of a voluntary bankrupt to review an order of the Referee in Bankruptcy dated April 17, 1967, holding the bulk of some $1,273.71 of "Separation Allowance," otherwise becoming payable to the bankrupt upon termination of employment subsequent to adjudication, to be the property of the trustee under Section 70 (a) of the Bankruptcy Act (Title 11 U.S. C. § 110(a)).

The bankrupt contends that these funds, being subject to a "spendthrift trust" provision of the union contract and being "contingent" until paid, were not wages and did not pass to the trustee under Section 70(a). The trustee contends that these funds were "wages" earned under the union contract; that the "spendthrift" provision was self-serving and void under state law; but that even if not so, they were Section 70(a) (5) property passing to the trustee because the employee could, at least with the cooperation of the employer, effect a transfer thereof to his family.

The Referee found that the basic right to receive the separation pay was a right of action arising under the union contract and therefore passed to the trustee under Section 70(a) (6). He found, however, because the separation pay was earned at the rate of $1.81 per week, and four of the weeks involved were worked by the bankrupt subsequent to bankruptcy, that the trustee should pay him the sum of $7.24 out of the total fund; and the matter is here on Certificate of Review.

It is agreed by all concerned that the whole question is whether title to this separation pay (or most of it) was in the trustee or whether it is to be considered after-acquired property belonging to the bankrupt.

Mitchell Durham, the bankrupt, had been employed by Armour and Company, a Corporation, at its Peoria, Illinois, plant for approximately 13½ years. He is a member of The Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, and the terms of his employment were specified in a Master Agreement entered into between the union and the company. The material provisions of that agreement in regard to separation pay are as follows:

## ARTICLE XIX
## SEPARATION ALLOWANCE

19.1 Separation Allowance—To Whom Paid.

Separation allowances, determined in accordance with Section 19.3, shall be paid to employees having one or more years of continuous service, as defined in the vacation provisions, who are permanently dropped from the service because of a reduction in forces arising out of the closing of a department or unit of the business, or as a result of technological changes and when it is not expected that they will be re-employed. * * *

19.2 When not paid.

Separation allowances shall not be paid:

(a) To employees with less than one year's continuous service;

(b) To employees laid off in gang reductions; except as provided in the second paragraph of Section 19.1;

(c) In cases where the employee was discharged for cause;

(d) In cases of voluntary resignation;

(e) To employees who refuse an offer of employment by the company in another department or another unit of its business, the location of which is reasonably accessible to the location of the place of employment from which the employees are being dropped from the service, * * *.

19.3 Amount of Payment.

In order to reflect the fact that Separation Pay is earned during periods of employment with the Company, and is payable with respect to said past service, the amount of Separation Pay shall be computed as multiple equivalents of weeks of wages times years of continuous service, in accordance with the following schedule. Payments are to be computed on the basis of forty (40) hours per week at the employee's regular rate as follows:

1 through ten (10) years of continuous service: One week's pay for each year of Continuous Service.

11 through 20, add to the computation for 10 years: 1¾ week's pay for each year of continuous service above ten (10) years.

21 and over, add to the computation for 20 years: 2 weeks' pay for each year of continuous service above twenty (20) years. * * *

19.4 Method of Payment.

The amount due under this Article shall be paid as follows:

(1) If less than the equivalent of four weeks' pay—in one lump sum.

(2) Amounts over a total of four weeks' pay—weekly installments of full wages until the total amount is exhausted. The employee, at his option, may elect to receive such amount in a shorter period of time or in one lump sum.

(3) In the event of death, any unpaid balance shall be paid to the beneficiary of the Group Life Insurance Policy.

19.5 Non-Alienation of Benefits:

The Company shall not in any manner be liable for or subject to the debts or liabilities of any individual by reason of the existence or operation of the separation allowance provisions. No right or benefit at any time under the separation allowance program shall be subject in any manner to alienation, sale, transfer, assignment, pledge, or any encumbrance of any kind. If the employee or former employee shall attempt to or shall alienate, sell, transfer, assign, pledge, or otherwise en-

cumber his right, benefits, or amounts payable under the separation allowance program or any part thereof, or if by reason of his bankruptcy or other events happening at any time such benefits would otherwise be received by anyone else or would not be enjoyed by him, the Company in its discretion may terminate his interest in any such right or benefit and hold or pay to it, or for benefit of such person, his spouse, children, other dependents, or any of them as the Company may determine.

\* \* \* \* \* \*

## ARTICLE XXV
### NOTICE OF PLANT CLOSING AND TECHNOLOGICAL ADJUSTMENT PLAN

25.1 Notice of Plant Closing.

The Company shall give notice in writing to both the International and Local Union of the closing of a plant or a division of a plant, or a major department of a plant, at least ninety (90) calendar days prior to such closing.

On December 19, 1966, pursuant to Section 25.1 of the agreement, the Company posted a notice at the Peoria plant notifying the employees of the permanent closing of operations at the Peoria plant. A copy of this notice was sent to the union.

On February 14, 1967, Mitchell Durham was adjudicated a bankrupt in this Court, and on March 3, 1967, Jerry T. Stafford was elected Trustee. On that same day said Trustee filed a petition asking that Armour and Company be ordered to pay to him all separation pay to become due the bankrupt because of the closing of the Peoria plant.

The Peoria plant of Armour and Company was closed on March 19, 1967, and Mitchell Durham was permanently dropped from the employ of the company due to the closing. Durham had been offered employment in the San Francisco, California, plant of Armour and Company but refused to accept it. He also indicated that he wanted his separation pay in a lump sum rather than in weekly payments.

Armour and Company, pursuant to an order of the Referee, paid to the Trustee the amount of $1,273.71, representing the net amount of the separation pay due Durham after tax withholdings and authorized deductions. The Trustee is holding these funds pending a decision in this matter. There is no indication that the Company sought to exercise the discretion reserved to it under the final sentence of Section 19.5 of the union contract.

The precise issue here presented has not been found in prior published decisions. Its resolution appears to rest in the terms of the union contract. Section 70(a) of the Bankruptcy Act (Title 11 U.S.C. § 110(a)) clearly vests in the trustee broadly specified types of property of the bankrupt (except that which is exempt) as of the date of filing of the petition, including in subdivision (5) "rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him \* \* \*" (with certain specified exceptions which don't appear to be applicable) and in subdivision (6) "rights of action arising upon contracts \* \* \*".

The general rule on earnings, as stated in Collier on Bankruptcy, Volume 4, Page 1286, is:

"A trustee in bankruptcy takes title to all wages, fees and commissions earned and accrued prior to bankruptcy, or that relate to services already performed, even though they may be paid subsequent thereto. He succeeds to the right to collect such sums as are due, if not paid. \* \* \*"

The theory of the Bankruptcy Act quite clearly is that the bankrupt should have the ownership of all future earnings, unfettered from the claims of creditors. However, moneys earned prior to bankruptcy should go to the Trustee for the benefit of the bankrupt's creditors. This philosophy was expressed

by the Supreme Court of the United States in Segal v. Rochelle, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1965). In that case, the bankrupt had paid substantial income taxes in the years 1959 and 1960. In 1961, he suffered losses and was adjudicated a bankrupt on September 27, 1961. The Supreme Court held that the bankrupt's loss carryback refund claim passed to the Trustee in Bankruptcy, even though the right to claim the refund did not accrue until January 1, 1962, and even though this right could have been entirely defeated by the earnings of the bankrupt subsequent to bankruptcy. The Court felt that the right to a refund was related to the bankrupt's past rather than his future. The Court stated on page 379, 86 S.Ct. on page 515, in construing Section 70 of the Bankruptcy Act, as follows:

> " * * * To this end the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed. * * *

> "However, limitations on the term do grow out of other purposes of the Act; one purpose which is highly prominent and relevant in this case is to leave the bankrupt free after the date of his petition to accumulate new wealth in the future. Accordingly, future wages of the bankrupt do not constitute 'property' at the time of bankruptcy nor, analogously, does an intended bequest to him or a promised gift—even though state law might permit all of these to be alienated in advance. E. g., In re Coleman, 2 Cir., 87 F.2d 753; see 4 Collier, Bankruptcy 70.09, 70.27 (14th ed. 1962). Turning to the loss carryback refund claim in this case, we believe it is sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70a(5).

"Temporarily, two key elements pointing toward realization of a refund existed at the time these bankruptcy petitions were filed: taxes had been paid on net income within the past three years, and the year of bankruptcy at that point exhibited a net operating loss. The Segals stress in this Court that under the statutory scheme no refund could be claimed from the Government until the end of the year, but as cases already cited indicate, postponed enjoyment does not disqualify an interest as 'property'."

The bankrupt here would distinguish the *Segal* case on the grounds that the tax refund there was not contingent at the time of bankruptcy and that there was no "spendthrift" protection surrounding it. It seems clear, however, that neither ground conflicts with the fundamental rationale of the *Segal* case. Neither contingency nor postponed enjoyment prevent a right arising out of contract from being considered property under Section 70 of the Bankruptcy Act. The contingency here did not occur and there was no attempted exercise of the employer's reserved right under the union contract to "terminate" the bankrupt's interest upon bankruptcy. Section 19.3 of the union contract makes crystal clear that the fund was "earned during periods of employment" and was not something arbitrary in amount which came into being after bankruptcy. Except for the small portion arising from work after bankruptcy, as the Referee found, this fund of separation pay seems clearly rooted in the pre-bankruptcy past and has nothing more to do with his ability to make an unencumbered fresh start than would any other property over his exemptions which he might prefer to keep from his creditors.

Accordingly, the order of the Referee in Bankruptcy, dated April 17, 1967, here under review, is in all respects sustained, and it is so ordered upon the filing hereof.